**Wilhelm H. VON AULOCK and J.M. Hidalgo, Appellants,**

v.

**J. Clay SMITH, Jr., Acting Chairman, Equal Employment Opportunity Commission.**

No. 82–2279.

United States Court of Appeals, District of Columbia Circuit.

Argued May 25, 1983.

Decided Oct. 21, 1983.

Beth Nolan, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Stanley S. Harris, U.S. Atty., Larry L. Simms, Deputy Asst. Atty. Gen., Dept. of Justice, Philip B. Sklover, Associate General Counsel, Vella M. Fink, Asst. General Counsel, Colleen M. O'Connor and Christopher Mackaronis, Attys., E.E.O.C., Washington, D.C., were on brief, for appellee.

Edgar Pauk of the Bar of the Supreme Court of N.Y., pro hac vice, New York City, by special leave of Court, with whom Jonathan A. Weiss, New York City, Michael Nussbaum and Kate A. Martin, Washington, D.C., were on brief, for appellants.

Before TAMM, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Appellants challenge an Interpretative Bulletin of the Equal Employment Opportunity Commission ("EEOC") that they allege authorizes their employers to maintain pension plans that violate the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (1976 & Supp. V 1981). The issue on this appeal is whether appellants' complaint presents a case or controversy—*i.e.,* whether appellants have standing—even though invalidation of the Interpretative Bulletin would not compel appellants' employers to grant prospective or retrospective relief from the allegedly unlawful pension plans. The district court granted appellee's motion to dismiss for lack of jurisdiction. *Von Aulock v. Smith,* 548 F.Supp. 196 (D.D.C.1982). We affirm because we conclude that appellants' injury, which was suffered at the hands of their

quired. If the latter are irrelevant under *Har-*

*low,* I would assume the former would be also.

employers, is not fairly traceable to the EEOC's maintenance of the Interpretative Bulletin as an interpretive regulation.

## I.

According to the complaint, whose factual allegations we must accept as true in reviewing the jurisdictional dismissal, *see Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), appellant Von Aulock is an employee of Bell Laboratories in New Jersey. He is a participant in a Bell pension plan established on January 1, 1979, the day Bell raised its mandatory retirement age from 65 to 70 in order to comply with the 1978 amendment of the ADEA. Under Bell's plan, Von Aulock's pension will be calculated on the basis of his employment status at the time he reaches the normal retirement age of 65. Thus, although Von Aulock has continued to work past that age, his pension benefits have not been increased to take account of this work. In addition, Von Aulock's pension benefits will not be increased to reflect his shorter expected lifespan when he retires and begins collecting benefits at an age past 65. Finally, Von Aulock is not eligible for a new Bell plan that has higher benefits and is generally available to persons who are active employees on August 10, 1980, but is not available to employees such as Von Aulock who are past the age of 65 on that date; that is, the benefit improvement does not apply to employees past the age of 65.

Appellant Hidalgo is a former employee of Rockwell International in California and a participant in a Rockwell pension plan. Hidalgo retired from Rockwell at the age of 66, taking advantage of Rockwell's raising of its mandatory retirement age from 65 to 70. Nonetheless, Hidalgo's benefits under Rockwell's pension plan were based on his employment status at the time he reached 65; the benefits took no account of his salary and cost-of-living increases in his final year of employment.

Appellants alleged in their complaint that their employers' pension plans discriminated against them solely because they were over age 65. They further alleged that their employers' refusal to adjust pension benefits to take account of service past age 65 has no age-related cost justification. The Bell and Rockwell pension plans, they therefore alleged, violated the ADEA's prohibition on "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (1976).

Rather than suing their employers under the ADEA, appellants brought this action against the EEOC. They alleged in their complaint that Bell and Rockwell maintain the challenged pension plans "because they are authorized to do so by" an Interpretative Bulletin of the EEOC. Complaint ¶¶ 28, 36. They contended that the Interpretative Bulletin is contrary to the ADEA and sought a judgment, pursuant to 28 U.S.C. § 2201 (1976), both declaring the invalidity of the current Bulletin and requiring the EEOC to promulgate new regulations consistent with the ADEA.

The challenged Bulletin is an interpretation of section 4(f)(2) of the ADEA. That section declares:

It shall not be unlawful for an employer . . .

(2) to observe the terms of a bona fide seniority system or any bona fide employment benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of [the ADEA] . . . .

29 U.S.C. § 623(f)(2) (Supp. V 1981). When Congress raised the upper age limit on coverage of the ADEA from 65 to 70, it became necessary to clarify the legal status of pension plans based, as many are, on a retirement age of 65. On May 25, 1979, the Department of Labor, which at that time had responsibility for administering the ADEA, issued the Interpretative Bulletin that is the subject of this lawsuit. 44 Fed. Reg. 30,648 (1979) (codified at 29 C.F.R. § 860.120(f)(iv)(B) (1981)).

The Interpretative Bulletin discusses two types of retirement plans: "defined contribution" plans and "defined benefit" plans.

Under the former type of plan, employers make designated contributions to the accounts of participating employees, who, at retirement, receive the amount that has accumulated, through employer contributions and interest, in their accounts. Under the latter type of plan, employees receive designated periodic payments upon retirement, and employers fund the plans with whatever is necessary, which depends on changing actuarial projections, to make the designated payments.[1] Appellants challenge five provisions of the Interpretative Bulletin, one relating to defined contribution plans, and four relating to defined benefit plans.

Subsection (1) states, in relevant part, that "[a] defined contribution plan may provide for the cessation of employer contributions after the normal retirement age of any participant in the plan," unless the plan is "supplemental" to a defined benefit plan or to another defined contribution plan. 29 C.F.R. § 860.120(f)(iv)(B)(1).[2] Subsections (3), (4), (5), and (7) provide that a defined

benefit plan need not give credit, in calculating benefit accrual, for an employee's service past normal retirement age and need not actuarially adjust the benefits accrued to reflect abnormally late retirement. Those subsections also state that a defined benefit plan need not provide for the accrual of benefits during service past normal retirement age. Finally, they provide that a defined benefit plan need not take account of salary increases or plan improvements that take effect after an employee's normal retirement age, though denial of such increases and improvements is conditioned on the employer's giving the employee the benefit of any improvements made in the plans that apply to persons already retired; in short, the late-retiring employee must be treated either as a retiree or as a younger employee.[3] We assume that appellants' description of the Bell and Rockwell pension plans is accurate and, therefore, that the Interpretative Bulletin does, as appellants allege, condone the two challenged plans.

---

1. It is not entirely clear from the record whether the Bell and Rockwell plans are defined contribution or defined benefit plans, though it appears from appellants' allegations of illegality that the two plans are of the latter type. Further, the allegations of the complaint make clear that appellant Hidalgo is unaffected by subsection (7) of the challenged Interpretative Bulletin. *See infra* note 3.

2. Subsection (1) provides in full as follows:

   A defined contribution plan may provide for the cessation of employer contributions after the normal retirement age of any participant in the plan. A defined contribution plan may also provide that no employer contributions shall be made on behalf of an employee who is hired after normal retirement age. However, these provisions apply only with respect to plans which are not "supplemental". Any defined contribution plan is deemed "supplemental" with respect to any employee who is a participant in it as well as in a defined benefit plan maintained by the employer. Where an employer has no defined benefit plan but two or more defined contribution plans, all but one of the defined contribution plans are "supplemental" with respect to those employees who are participants in them. The one defined contribution plan which is not "supplemental" could provide for the cessation of employer contributions after normal retirement age. The em-

ployer can designate which one of the defined contribution plans is not "supplemental".
29 C.F.R. § 860.120(f)(iv)(B)(1).

3. Subsections (3), (4), (5), and (7) provide in full as follows:

   (3) A defined benefit plan may fail to credit, for purposes of benefit accrual, service which occurs after an employee's normal retirement age.

   (4) A defined benefit plan need not adjust actuarially the benefit accrued as of normal retirement age for an employee who continues to work beyond that age. (A defined contribution plan would have to pay the balance in the individual account.)

   (5) A defined benefit plan need not provide for the accrual of benefits for an employee who continues to work after normal retirement age.

   (7) A defined benefit plan need not take into account salary increases and benefit improvements under the plan which take place after an employee reaches the normal retirement age specified in the plan with respect to those employees continuing their employment beyond that age. However, benefit improvements for retirees may not be denied to such employees who do not receive the advantage of benefit accruals and increases given younger employees.
29 C.F.R. § 860.120(f)(iv)(B)(3), (4), (5), (7).

One month after the Department of Labor promulgated the Bulletin, the EEOC took over the administration and enforcement of the ADEA. Reorg. Plan No. 1 of 1978, 3 C.F.R. 321 (1979), *reprinted in* 5 U.S.C. app. at 1155–56 (1982), *and in* 92 Stat. 3781 (1978). The EEOC announced that it had undertaken a complete review of Labor Department interpretations of the ADEA and that those interpretations would remain in effect until new interpretations were adopted. 44 Fed.Reg. 37,974–75 (1979). Since that time, the EEOC has issued modified interpretations on a variety of subjects covered by the Labor Department carryover interpretations. *See* 46 Fed.Reg. 47,724 (1981); 44 Fed.Reg. 68,858 (1979). But the Interpretative Bulletin challenged by appellants, which the EEOC maintains is still under substantive review, remains in effect. *See* 46 Fed.Reg. at 47,-726.[4]

Soon after the filing of the complaint in this case, appellee Smith moved to dismiss the action on the ground that the complaint failed to present a justiciable case or controversy. Appellee argued that the Interpretative Bulletin, being merely an agency interpretation and hence not binding on employers, was not the cause of appellants' injury and that its invalidation would not likely result in redress of appellants' injury.

Appellants countered that Bell's and Rockwell's maintenance of their plans was in fact fairly traceable to the Interpretative Bulletin. More particularly, they alleged that, because the Portal-to-Portal Pay Act, 29 U.S.C. § 259 (1976), is applicable to the ADEA, 29 U.S.C. § 626(e)(1) (Supp. V 1981), they suffer a direct injury in that the Bulletin deprives them of any remedy against their employers for any discriminatory action taken in good faith reliance on an EEOC interpretation, even if that interpretation eventually is declared to be contrary to law.[5] The effect of the Bulletin, in other words, is to immunize employers from liability in damages for actions taken in good faith reliance upon the Bulletin prior to a determination that the Bulletin's position is wrong and their actions illegal.

The district court granted the motion to dismiss. The court concluded that appellants had "not alleged a sufficient nexus between their injury and the government action attacked to justify judicial intervention. *Linda R.S. v. Richard D.,* 410 U.S. 614, 617–18 [93 S.Ct. 1146, 1148–49, 35 L.Ed.2d 536] (1972)." 548 F.Supp. at 197. In particular, the court thought "purely conjectural" the possibility that an employer would plead and prove good faith reliance on the Bulletin as an affirmative defense in an ADEA suit by an employee.

---

**4.** In June, 1980, the EEOC circulated to federal agencies a draft of a proposed interpretation that substantially modified the Bulletin inherited from the Department of Labor. *See* Pens. Rep. No. 293 (BNA) R–8 (June 2, 1980); Affidavit of Eleanor Holmes Norton, chair, EEOC, Appendix to Brief of Appellants at A–25 to A–26. The circulated interpretation, however, has never been promulgated or even proposed by publication in the *Federal Register.*

At oral argument, government counsel informed the court that in March, 1983, the EEOC held a public meeting to solicit information for its review of the Interpretative Bulletin. Counsel also told the court that the EEOC is actively considering whether to retain or to modify the Bulletin. *See* Sunshine Act Meeting Notice, 48 Fed.Reg. 10,516 (1983). It is worth noting, however, that field notes addressed to EEOC staff, as published in the May 16, 1983, issue of the *Pension Reporter,* 10 Pens.Rep. (BNA) 873–74 (1983), state that the EEOC does not expect any future interpretation to differ substantially from the current Bulletin.

**5.** The Portal-to-Portal Pay Act states, in relevant part, as follows:

[N]o employer shall be subject to any liability or punishment ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the [relevant] agency of the United States ... or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

29 U.S.C. § 259 (1976).

*Id.* Judgment was accordingly entered for appellee, and this appeal followed.

## II.

The Constitution imposes at least three requirements on a plaintiff claiming standing in federal court.

> At an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). For appellants to establish standing in this case, therefore, they must allege (1) an injury that is (2) fairly traceable to the Interpretative Bulletin and (3) likely to be redressed by a judicial decision invalidating the Bulletin. *See Community Nutrition Institute v. Block,* 698 F.2d 1239, 1245 (D.C. Cir.1983); *Consumers Union v. FTC,* 691 F.2d 575, 577 n. 9 (D.C.Cir.1982) (en banc).

Appellants have alleged two injuries in their attempt to meet the constitutional requirements for standing. First, they have pointed to the unlawfully low pensions provided for by their employers' pension plans. This injury is a traditional economic harm. Second, they have pointed to the legal impossibility, due to the ADEA's incorporation of the Portal-to-Portal Pay Act, of holding their employers liable for past violations of the ADEA while the Interpretative Bulletin remains an agency regulation. This injury is the deprivation of all possibility of securing the higher pensions to which they claim an entitlement.

A decision of this court makes clear that the second injury—carefully defined so that the "fairly traceable" and "redressability" requirements for standing are satisfied—is not constitutionally sufficient. *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258 (D.C.Cir.1980), expressly rejected the argument that "any litigant who can allege that he is seeking to remove an 'absolute barrier' to the relief he ultimately desires must have standing." *Id.* at 264. The court held that the existence of one absolute barrier was sufficient injury only if its removal would mean that all other barriers to the ultimately sought relief were likely to fall. *Id.* at 264–65. This holding followed directly from Supreme Court precedent. In *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), for example, the Court held that the plaintiffs had no standing even though they sought a legal change (a zoning variance) that was a necessary condition, though not the only one, for relief from the injury they ultimately complained of (the absence of low-income housing). The second injury asserted by appellants in this case is identical to that asserted in *Goldschmidt* and must likewise be deemed insufficient to confer standing.

Jurisdiction over appellants' complaint therefore depends on the adequacy of appellants' primary claim of injury. Since deprivation of legally required pension benefits unquestionably constitutes injury in fact, it is the other two requirements for standing that present problems for appellants. To satisfy those requirements, the allegations of their complaint must enable this court to conclude that the allegedly unlawful pension plans are fairly traceable to the existence of the Interpretative Bulletin and are likely to be altered to conform to the ADEA if this case were to result in the invalidation of the Interpretative Bulletin.

These two requirements have been treated as distinct. *See Community Nutrition Institute v. Block,* 698 F.2d at 1244–45. They are nonetheless closely related, especially where, as here, the injury complained of is future injury, *i.e.,* the future maintenance of unlawful pension plans.[6] *Id.* In-

---

6. Appellants have not complained of any actionable past injury. They have repeatedly stated in this litigation that their employers are

deed, they were initially articulated by the Supreme Court as "two facets of a single causation requirement." C. Wright, *Law of Federal Courts* § 13, at 68 n. 43 (4th ed. 1983); *see* 698 F.2d at 1244 n. 26 (quoting *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978), and *Warth v. Seldin,* 422 U.S. at 505, 95 S.Ct. at 2208). They both implement the prohibition on unnecessary, advisory opinions expressed in Article III's case-or-controversy requirement. As the Supreme Court stated in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976), "[t]he necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Article III requirement."

The "fairly traceable" requirement for standing, as applied to the injury in this case, demands that Bell's and Rockwell's future maintenance of their allegedly unlawful pension plans be fairly traceable to the continued existence of the Interpretative Bulletin. The "redressability" requirement is different, though obviously similar, because it does not focus, as the "fairly traceable" requirement does, on the direct "connection between the alleged injury and [appellee's] actions." *Community Nutrition Institute v. Block,* 698 F.2d at 1245. Rather, it focuses on the "connection between the alleged injury and the action requested of the court." *Id.* Thus, in this case, the "redressability" requirement demands that it be likely that Bell and Rockwell provide appellants with more favorable, lawful pension plans once appellants have secured from this lawsuit a judgment that the Interpretative Bulletin is contrary to the ADEA. Since the "fairly traceable" requirement is a causation requirement, *see id.,* it, like the "redressability" requirement, directs us to assess the likely effect on appellants' employers of the absence of the Interpretative Bulletin. The "redressability" requirement directs us to assess, in addition, the likely effect on the employers of

a judicial declaration of the invalidity of the Bulletin.

Although the standing inquiry in this case involves the delicate task of guessing the likely action in hypothetical situations of parties not before the court, "[t]he mere fact that ultimate relief to the appellants depends on the actions of third parties does not by itself defeat appellants' standing . . . ." *Committee for Full Employment v. Blumenthal,* 606 F.2d 1062, 1066 (D.C.Cir. 1979). "[T]he indirectness of the injury," however, "may make it substantially more difficult to meet the minimum requirement of Article III . . . ." *Warth v. Seldin,* 422 U.S. at 505, 95 S.Ct. at 2208. In a case such as this, therefore, we must exercise special care to ensure that standing is not being rested on "injury that results from the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 41–42, 96 S.Ct. at 1925–26. Upon assessing the likely effect on Bell and Rockwell of the absence of the Interpretative Bulletin, we conclude that appellants' injury is the result of their employers' independent action and therefore is not fairly traceable to the Bulletin.

One reason we draw that conclusion is that both Bell and Rockwell have maintained the pension plans challenged by appellants at least since January 1, 1979, the effective date of the 1978 ADEA amendments. The Interpretative Bulletin, though proposed in September 1978, was promulgated almost six months later, on May 25, 1979. 44 Fed. Reg. 30,648 (1979). Appellants' employers thus evidently did not feel it necessary to delay adoption (or temporarily to suspend) their pension plans until they could claim the protection, through the Portal-to-Portal Pay Act, of the Bulletin. They made a decision to maintain the challenged plans, for which they were at risk for six months (perhaps longer), based on an independent judgment about the legality of their plans, a judgment whose independence would be diminished only slightly if it incorporated predictions about the final action of the

insulated from retrospective liability by the Portal-to-Portal Pay Act.

Labor Department and about judicial deference to agency interpretations. That judgment is some evidence of the likely effect on Bell and Rockwell of the absence of the Interpretative Bulletin.

Much more important, however, is the basis appellants' employers had in January, 1979, and have today for the maintenance of their pension plans wholly independent of the Interpretative Bulletin. The statute does not by its terms authorize the challenged aspects of the Bell and Rockwell plans. Rather, to the general proscriptions of the ADEA it makes a broad exception for "any bona fide employee benefit plan . . . which is not a subterfuge to evade the purposes of [the Act]." 29 U.S.C. § 623(f)(2) (1976). This broad exception is thus defined in statutory language whose meaning in particular circumstances may be, though of course need not be, decisively determined by legislative history. Just such circumstances seem to be presented by the questions whether the challenged portions of the Interpretative Bulletin violate the ADEA. The legislative history of the 1978 amendments to section 4(f)(2)—in which Congress overturned *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), by adding the statement that "no such . . . employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 12(a) of this Act because of the age of such individual," 29 U.S.C. § 623(f)(2) (Supp. V 1981)—provides explicit and extremely strong support for the correctness of the challenged portions of the Interpretative Bulletin and hence for the lawfulness of the Bell and Rockwell plans insofar as they are indirectly challenged by appellants' challenge to the Bulletin.

Congress amended the ADEA in 1978 in two principal respects: it raised the age limit on the coverage of the Act from 65 to 70, and it prohibited pension plans that provided for mandatory retirement. S.Rep. No. 493, 95th Cong., 1st Sess. 1 (1977), U.S. Code Cong. & Admin.News 1978, p. 504. Together, these two amendments made it necessary to address "[t]he argument that

pension and other employee benefit plan costs would increase if the act's upper age limit is increased," *id.* at 5, U.S.Code Cong. & Admin.News 1978, p. 508, which was, as one might expect, a major source of concern to Congress. The relevant Senate Report states that that argument had "not been substantiated." *Id.* In support of that conclusion, the Senate Report notes that the ADEA would not interfere "with the relevant provisions of the 1974 pension law [ERISA]." *Id.* The Report then states:

> This legislation . . . does not require the accrual of additional benefits or the payment of the actuarial ·equivalent of normal retirement benefits to employees who choose to work beyond the plan's normal retirement date.

> Included in this report is a letter from Assistant Secretary [for Labor for Employment Standards] Elisburg responding in detail to questions from the Chairman and ranking minority member of the committee on the relationship between ERISA and the proposed amendments to the ADEA which reaffirms the committee's intent in this regard.

*Id.* The Elisburg letter gives answers to specific questions. It states, in relevant part, as follows:

> *Question 1.* Would an employer be required to credit years of service for purposes of benefit accrual after normal retirement age?

> Answer. It is our view that nothing in the ADEA or in the proposed amendments would require an employer to credit, for purposes of benefit accrual, those years of service which occur after an employee's normal retirement age. . . .

> *Question 2.* Would an employer be required to pay the actuarial equivalent of normal retirement benefits to an employee who continues to work beyond the normal retirement age?

> Answer. No. There will not have to be any adjustment in the size of the periodic payments at the time of actual retirement. . . .

*Question 3.* If the upper age limit is raised, some employees who choose to work beyond age 65 will be participants in plans which provide for the commencement of retirement benefits at age 65. Could such plans be amended to provide that retirement benefits would commence at the actual date of retirement without violating the ADEA or ERISA?

Answer. [N]either ... the ADEA nor ERISA require[s] the payment of retirement benefits to employees who continue to work beyond normal retirement age.

*Question 4.* Would an increase in the upper age limit of the ADEA increase the funding costs for private pension plans?

Answer. An increase in the upper age limit of the ADEA would not increase the funding costs for private pension plans. As a matter of fact, financial pressure on private pension plans could be alleviated.... As an actuarial matter, the longer an employee works, the shorter the period retirement payments will have to be made, thus lowering the funding assumptions of the plan. Savings would of course come from the added years of accumulated interest on the fund. Savings would also stem from the fact that, as indicated above, a plan need not provide for further accrual of benefits after the participant has reached the plan's normal retirement age, and thus the added years of service do not increase the ultimate retirement benefit or the cost of providing it.

. . . .

*Question 5.* Assuming that under ERISA a plan need not provide for benefit accruals for an employee who continues to work after the normal retirement age, would an employer's failure to provide for the accrual of benefits for such an employee constitute age discrimination under the ADEA?

Answer. In our opinion, a bona fide pension plan that provides that no benefits accrue to a participant who continues service with the employer after attainment of normal retirement age would not violate the ADEA. Under Section 4(f)(2) of the ADEA, it is not unlawful to observe the terms of a bona fide pension plan that is not a subterfuge to evade the purposes of the ADEA. As I noted in my testimony, the legislative history of the ADEA indicates that Section 4(f)(2) was intended to allow age to be considered in funding a plan and in determining the level of benefits to be paid. We believe that it will run counter to the intent of the Act to require a plan to provide for benefit accrual after the plan's normal retirement age.

*Id.* at 14–16, U.S.Code Cong. & Admin. News 1978, pp. 517–519. The Senate passed its version of the ADEA amendments without altering the legislation reported by the committee in any relevant respect.

The legislative history in the House is much the same. The relevant House committee report states that the proposed amendments would neither change nor supplement the requirements of ERISA. H.R. Rep.No. 527, 95th Cong., 1st Sess. 9 (1977). The Report states: "These amendments do not require that any additional benefits, benefit accruals or actuarial adjustments be provided other than those required under ERISA." *Id.* Congressman Ted Weiss, in his additional statement appended to the committee report, noted that "ERISA does not require increased actuarial adjustments if an employee chooses to work beyond the ERISA-defined retirement age of 65." *Id.* at 29. Moreover, in the House debate immediately preceding passage of the House version of the ADEA amendments on September 23, 1977, a letter from Assistant Secretary Elisburg virtually identical to that contained in the Senate report was introduced into the record. 123 Cong.Rec. 30,563–64 (1977).

The two versions of the ADEA amendments were substantially the same insofar as the amendment to section 4(f)(2) is concerned. H.R.Conf.Rep. No. 950, 95th Cong., 2d Sess. 7 (1978). The House receded to the Senate amendment in the conference bill that was sent to the two houses. *Id.* at 8. On March 21, 1978, the day the House passed the amendments, *two of the House*

managers, fresh from the Conference Committee, had the following exchange on the floor of the House:

MR. DENT. Mr. Speaker, in order that there be no question about the committee handling of pension legislation, I have arranged with the gentleman from California to make the record very clear. I would like to put this question to the gentleman:

Is it the intention of the conferees that an employer will be permitted, under the Age Discrimination in Employment Act of 1967 as amended, to maintain a defined contribution plan—other than a plan which is merely supplemental to a defined benefit or defined contribution plan maintained by the employer—which precludes employer and, if applicable, employee contributions to such a plan subsequent to an employee's attainment of the normal retirement age contained in the plan?

MR. HAWKINS. Yes. The answer to the gentleman's question is "Yes".

The conferees intend that an employer will not violate the Age Discrimination in Employment Act by maintaining such a defined contribution plan. This position is in keeping with the general view of the House and the Department of Labor with regard to prohibited age discrimination in the context of pension plans covering employees who continue employment beyond the normal retirement age, as expressed in a letter of September 8, 1977, from Assistant Secretary Elisburg to me which appears in the CONGRESSIONAL RECORD of September 23, 1977, at page 30564.

124 Cong.Rec. 7881–82 (1978). The two principal managers in the Senate had a similar exchange on the Senate floor on March 23, 1978, the day the Senate passed the amendments.

[MR. JAVITS.] Mr. President, if I may have the attention of the chairman of our committee and manager of the conference report on the floor, I wish to clarify a number of issues involving employee benefit plans and the Age Discrimination in Employment Act of 1967, as modified by the 1978 amendments. I want to ask our distinguished committee

chairman whether he agrees that an employer will be permitted under the act, as amended, to maintain a defined contribution plan—other than a plan which is merely supplemental to a defined benefit or defined contribution plan maintained by the employer—which precludes employer and, if applicable, employee contributions to such a plan subsequent to an employee's attainment of the plan's normal retirement age.

MR. WILLIAMS. The answer is "yes." I completely agree with the statement of the distinguished Senator from New York. Your statements are consistent with the position taken by the Department of Labor regarding these matters. As Assistant Secretary Elisburg's letter, which appears in the Senate committee report makes clear, employers will not be required to continue contributions to either defined benefit or defined contribution plans for employees who continue working beyond normal retirement age.

124 Cong.Rec. 8218 (1978).

Because the issues going to the merits have not been joined in this litigation, we cannot and do not decide whether the Interpretative Bulletin is consistent with the ADEA. Hence, we do not undertake any further analysis of the legislative history or of its significance for the particular provisions of the Interpretative Bulletin under challenge. With legislative history so directly addressed to the challenged aspects of the Bell and Rockwell plans, however, we find inescapable the conclusion that it is highly likely that appellants' employers would continue to maintain their challenged plans even in the absence of the administrative support provided by the Interpretative Bulletin, relying directly on the statutory support for their practice of freezing the pension costs for an employee when the employee reaches age 65. Appellants, we must conclude, have not shown that their injury—their employers' future maintenance of the allegedly unlawful pension plans—can fairly be traced to the EEOC's Interpretative Bulletin.

Our analysis of the "fairly traceable" component of constitutional standing in this case is evidently somewhat unusual, as it

involves a reasonably extensive inquiry into the underlying merits of the lawsuit. Ordinarily, determining standing does not require this sort of exploration of the merits. *See, e.g., Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2206; *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). Nevertheless, some inquiry into the merits is necessary in a variety of situations presenting justiciability questions—those involving, for example, the "zone of interests" test for standing, *id.,* or the question of ripeness, *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), or the political question doctrine, *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), or even the injury-in-fact component of standing where the injury claimed is one that qualifies for constitutional purposes only because a law has protected it, *Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2206. In any event, examination of the merits seems to us unavoidable where an interpretative regulation is challenged as authorizing a party not before the court to inflict injury on the plaintiff. Whether the third party's actions are fairly traceable to the existence of the interpretative rule—which of course has no legal force on its own, *see General Electric Co. v. Gilbert,* 429 U.S. 125, 141–45, 97 S.Ct. 401, 410–12, 50 L.Ed.2d 343 (1976) —depends on, among other things, what support for those actions the third party can find directly in the statute that the rule interprets. Some statutory construction is therefore necessary in determining whether the plaintiff has satisfied the "fairly traceable" requirement for standing.

The "redressability" requirement for standing presents an even thornier problem in a case such as this; that is why we rest our decision on the "fairly traceable" ground. As indicated above, addressing the "redressability" requirement in this case would necessitate asking how Bell and Rockwell would be likely to respond to a judicial declaration that the Interpretative Bulletin is invalid. The statutory support they could find for the legality of their pension plans suggests that they would continue to maintain their plans. On the other hand, a judicial pronouncement that the plans violate the ADEA, even if issued in the face of contrary legislative history, would have to give appellants' employers some pause in deciding not to conform their conduct to the court's opinion. In making such a decision, they would have to consider not only the fact that the court's judgment is not binding on nonparties but also the *stare decisis* and precedential effect of the case. Since both employers here are located in other circuits, the persuasiveness of the court's reasoning would have to become a crucial consideration.

To determine whether appellants' injury is likely to be redressed by a favorable decision in this case, we would seem to be compelled to speculate on what Bell and Rockwell would decide after considering these factors. We would not welcome such a task, and indeed the speculative character of the determinations involved may demand the rejection of appellants' standing. We need not reach this issue, however, for we hold that appellants have not alleged facts sufficient to show that their injury is fairly traceable to appellee's conduct.

The judgment of the district court is accordingly

*Affirmed.*