United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 24, 1998 Decided November 24, 1998 

 No. 97-7155

 Systems Council EM-3, 

 International Brotherhood of Electrical Workers, 

 AFL-CIO, et al.,

 Appellants

 v.

 AT&T Corporation, et al.,

 Appellees

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cv01117)

 Kent Cprek argued the cause for appellants. With him on 
the briefs were Richard B. Sigmond and Thomas H. Kohn.

 Joseph R. Guerra argued the cause for appellees. With 
him on the brief were Paul J. Zidlicky, Laura A. Kaster, T. 


Jay Thompson, Robert N. Eccles, Peter O. Shinevar and 
Karen M. Wahle.

 Michael S. Horne, John M. Vine and Caroline M. Brown 
were on the brief for amicus curiae Erisa Industry Commit-
tee.

 Before: Edwards, Chief Judge, Rogers and Tatel, Circuit 
Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: In 1995, pursuant to a corporate 
reorganization, AT&T Corporation ("AT&T") transferred its 
equipment business to Lucent Technologies, Inc. ("Lucent"). 
AT&T and Lucent subsequently entered into arrangements to 
separate their businesses; one such arrangement was embod-
ied in an Employee Benefits Agreement ("EBA"). Under the 
EBA, AT&T amended its pension and welfare plans to divide 
the assets and liabilities of AT&T's defined plans and to 
provide for the continuation of existing defined benefits for 
both AT&T and Lucent retirees and employees. The appel-
lants in this case--beneficiaries of the plans and their un-
ions--seek to overturn AT&T's amendments of the pension 
and welfare plans. In broad terms, appellants contend that 
AT&T rigged the allocation procedures so that by the time 
Lucent becomes responsible for the retirement benefits owed 
to its former AT&T employees, it might not have enough 
money to provide for them. Appellants claim that AT&T's 
actions violated the Employee Retirement Income Security 
Act ("ERISA"), 29 U.S.C. ss 1001-1461, and also resulted in 
a breach of contract.

 We agree with the District Court that AT&T is not subject 
to ERISA's strict fiduciary standards, because it was not 
acting in a fiduciary capacity when it allocated pension and 
welfare plan assets and liabilities between AT&T and Lucent. 
We also agree that appellants have failed to state a claim 
under s 208 of ERISA, which protects the beneficiaries of 
spun-off plans. See 29 U.S.C. s 1058 (1994). Finally, it is 
clear that appellants' contract claims are not ripe for review. 
Accordingly, we affirm.

 I. Background

 The facts of this case have been comprehensively detailed 
in an excellent opinion by the District Court, see Systems 
Council EM-3 v. AT&T Corp., 972 F. Supp. 21, 24-26 (D.D.C. 
1997), and bear no repetition here. Therefore, this Back-
ground section is quite brief and will serve only to provide a 
context for our analysis.

 In 1995, AT&T decided to reorganize its corporate struc-
ture by spinning off operations into separate, publicly-traded 
businesses, one of which was Lucent. This case primarily 
concerns the EBA between AT&T and Lucent, which governs 
the allocation of employee pension and welfare plan assets 
and liabilities between AT&T and Lucent. See id. at 25-26. 
The EBA, which was signed on February 1, 1996, requires 
AT&T to calculate, for each AT&T and Lucent plan, an 
amount based on the funding policy historically used by 
AT&T to ensure adequate funding of employee benefit plans, 
employing the same actuarial assumptions used to determine 
minimum funding under ERISA and the Internal Revenue 
Code. Once the calculation is made, appropriate amounts are 
allocated to each fund. The EBA then allocates any residual 
(surplus) plan assets equally between AT&T and Lucent. See 
id. at 26.

 Appellants filed the instant lawsuit on May 17, 1996, before 
AT&T had actually allocated any assets to Lucent. Although 
they had no data to support their claims, appellants' com-
plaint in District Court was premised on the assumption that 
the EBA's prescribed methodology for the asset distribution 
unjustly favored AT&T. Alleging that AT&T acted in a 
fiduciary capacity with respect to the plan assets, appellants 
claimed that AT&T unlawfully favored itself in the allocation 
of those assets, in violation of the ERISA provisions that 
govern fiduciary responsibilities. See 29 U.S.C. ss 1104, 
1106(b) (1994 & Supp. II 1996). Appellants further alleged 
four separate violations of s 208, ERISA's non-fiduciary pro-
vision for the transfer of pension plan assets in a spin-off 
situation. First, appellants asserted that s 208 requires that 
the EBA provide for the division of any residual pension plan 


assets on a pro rata basis, rather than equally between the 
two entities. Second, appellants contended that the EBA's 
actuarial assumptions are not "reasonable," as required by 
the applicable Treasury regulations. Third, appellants pro-
tested that the EBA does not guarantee appellants the bene-
fit of any market earnings on the plan assets during the 
interim period between AT&T's divestment of Lucent stock 
and the actual segregation of AT&T's assets. Finally, appel-
lants alleged that the EBA does not account for possible 
future adverse business experiences that Lucent may suffer, 
rendering the company unable to meet its employee benefit 
obligations. Appellants also claimed that AT&T's signing of 
the EBA amounts to a breach of AT&T's agreement to 
provide pension and welfare plan benefits to its employees, 
because the EBA assigns to Lucent the obligation to provide 
those benefits.

 The District Court granted AT&T's motion to dismiss. 
Emphasizing that "[r]hetorical or emotional arguments voic-
ing fears about the future ... simply cannot substitute for 
rigorous analysis of the pertinent statutory provisions," the 
District Court held that appellants had failed to state any 
claim upon which relief could be granted. See Systems 
Council, 972 F. Supp. at 27. This appeal followed.

 II. Analysis

 A.Standard of Review

 We review de novo the District Court's dismissal of appel-
lants' claims under Rule 12(b)(6). See Taylor v. FDIC, 132 
F.3d 753, 761 (D.C. Cir. 1997). "Dismissal under Rule 
12(b)(6) is proper when, taking the material allegations of the 
complaint as admitted and construing them in plaintiffs' favor, 
the court finds that the plaintiffs have failed to allege all the 
material elements of their cause of action." Id. (citations 
omitted).

 B.Union Standing

 We need not decide whether the union appellants have 
standing to bring these ERISA claims. See Systems Council, 

972 F. Supp. at 27-28 (holding that unions do not have 
standing to bring civil actions under ERISA). It is undisput-
ed that the named plan beneficiaries have standing, see 29 
U.S.C. s 1132(a)(1) (1994), and we may therefore reach the 
merits of their claims regardless of whether the unions have 
standing. Cf. Craig v. Boren, 429 U.S. 190, 192-93 (1976) 
(deciding case on merits where one appellant had standing 
but the other did not).

 C.Fiduciary Claims

 ERISA s 3(21)(A) defines fiduciary, in relevant part, as 
follows:

 [A] person is a fiduciary with respect to a plan to the 
 extent (i) he exercises any discretionary authority or 
 discretionary control respecting management of such 
 plan or exercises any authority or control respecting 
 management or disposition of its assets, ... or (iii) he 
 has any discretionary authority or discretionary responsi-
 bility in the administration of such plan.

29 U.S.C. s 1002(21)(A) (1994). This definition applies to the 
entire subchapter, including the ERISA provisions on which 
appellants' claims are based. See 29 U.S.C. s 1002.

 It cannot be seriously disputed that, under ERISA, AT&T, 
as an employer and a plan administrator, is subject to 
ERISA's fiduciary standards only when it acts in a fiduciary 
capacity. See, e.g., Maniace v. Commerce Bank, 40 F.3d 264, 
267 (8th Cir. 1994). The issue in this case is whether AT&T 
acted in a fiduciary capacity when it amended its pension and 
welfare plans and allocated the assets and liabilities of those 
plans between AT&T and Lucent. The District Court found, 
and we agree, that appellants have failed to state a legally 
cognizable claim under ERISA's fiduciary provisions, because 
there has been no showing that AT&T acted in a fiduciary 
capacity in taking the actions at issue in this case.

 In Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 
(1995), the Court held that when employers "adopt, modify, or 
terminate welfare plans," they are not acting in a fiduciary 
capacity. The Court subsequently expanded the rule of 

Curtiss-Wright in Lockheed Corp. v. Spink, 517 U.S. 882 
(1996). In Lockheed, the employer, Lockheed, amended its 
pension plan to provide financial incentives for employees to 
retire early and release all employment-related claims against 
the company. These increased pension benefits were to be 
paid out of the plan's surplus assets. See id. at 885. The 
employees brought suit, alleging that Lockheed had violated 
its fiduciary duties under ERISA because it was using plan 
assets--the surplus--to purchase a benefit for itself--early 
retirement and the release of claims. See id. at 886. The 
Court foreclosed the employees' fiduciary claims, however, 
holding that "the act of amending a pension plan does not 
trigger ERISA's fiduciary provisions." Id. at 891. The 
Court noted that when employers amend or modify any type 
of employee benefit plan, even pension plans, "they do not act 
as fiduciaries but [rather] are analogous to the settlors of a 
trust." Id. at 890 (citation omitted). In other words, chang-
ing the design of a trust does not involve the kind of 
discretionary administration that typically triggers fiduciary 
responsibilities. See Sengpiel v. B.F. Goodrich Co., 156 F.3d 
660, 666-67 (6th Cir. 1998). This rule, according to the Court, 
"is rooted in the text of [s 3(21)(A)]." Lockheed, 517 U.S. at 
890. Although appellants urge us to consider the extensive 
common law of trusts in determining whether AT&T acted as 
a settlor or as a fiduciary when it amended its pension plans, 
the Lockheed Court's interpretation of s 3(21)(A) is disposi-
tive.

 Appellants further argue that Lockheed stands only for the 
unremarkable proposition that the power to name the benefi-
ciaries and define the benefits and liabilities of a trust is a 
settlor, not a fiduciary, power. We disagree. The plan 
design at issue in Lockheed involved far more than simply 
defining the trust; it involved the actual allocation of a 
portion of the trust corpus in a manner that presumably 
benefitted Lockheed. Indeed, it was the contention of the 
employees in Lockheed that the amendments to the pension 
plan "constituted a use of Plan assets to 'purchase' a signifi-
cant benefit for Lockheed." Id. at 886 (quoting Spink v. 
Lockheed Corp., 60 F.3d 616, 624 (9th Cir. 1995)) (emphasis 


added). Thus, contrary to appellants' narrow reading of 
Lockheed, the District Court was correct in stating that the 
case clarifies the "distinction between those actions creating, 
altering or terminating a trust, which are deemed settlor 
functions, and those actions managing and administering the 
investment and use of the trust assets, which are deemed 
fiduciary functions." Systems Council, 972 F. Supp. at 30.

 Under Lockheed, it is clear that AT&T was not acting as a 
fiduciary when it amended its pension and welfare plans 
under the EBA. Appellants' complaint in this case is quite 
similar to that of the employees in Lockheed: the employer 
has allocated the assets of its pension and welfare plans in a 
manner that allegedly benefits the employer to the employ-
ees' detriment. While such an allocation might in some 
circumstances violate certain ERISA provisions--such as 
s 208, discussed below--under Lockheed, it does not impli-
cate the statute's fiduciary provisions.

D. Section 208 Claims

 Congress provided for the protection of spun-off employees 
in s 208, which mandates that plan assets may not be trans-
ferred to another plan "unless each participant in the plan 
would (if the plan then terminated) receive a benefit immedi-
ately after the ... transfer which is equal to or greater than 
the benefit he would have been entitled to receive immediate-
ly before the ... transfer (if the plan had then terminated)." 
29 U.S.C. s 1058. Appellants have alleged four distinct 
violations of s 208.

1.Residual Assets

 Section 208 essentially requires the employer to contem-
plate a hypothetical plan termination, take a "snapshot" of the 
benefits each participant of the plan would receive in the 
event of a termination, and then provide the aggregate pres-
ent value of these benefits to the spun-off plan. Section 4044 
governs the allocation of any residual plan assets in the event 
of actual termination of a plan. See 29 U.S.C. s 1344(d)(3) 
(1994).


 Appellants point out that, under s 4044 and applicable 
regulations, if the pension plans at issue had actually termi-
nated immediately prior to the spin-off, appellants would have 
been entitled to a pro rata share of any residual assets. See 
29 C.F.R. s 2618.32(a) (1995). The EBA, on the other hand, 
provides for the equal division--between AT&T and Lucent--
of any residual assets. See Systems Council, 972 F. Supp. at 
26. Appellants claim that, in giving Lucent "only" an equal 
share of any residual assets, the EBA violates s 208 because 
the Lucent plans are entitled to a pro rata share of such 
assets under s 4044.

 Appellants' position finds no support in the case law. Sec-
tion 208 requires only that benefits payable upon hypothetical 
termination be no less after than before the spin-off, and 
creates no entitlement to residual assets that might be avail-
able upon actual termination of a plan. See, e.g., Brillinger v. 
General Elec. Co., 130 F.3d 61 (2d Cir. 1997), petition for cert. 
filed, 66 U.S.L.W. 3758 (U.S. May 13, 1998) (No. 97-1834); 
Malia v. General Elec. Co., 23 F.3d 828 (3d Cir. 1994). The 
District Court cited with approval the Third Circuit's opinion 
in Malia, which, after examining s 4044 and the accompany-
ing regulations, concluded that, because both explicitly distin-
guished "benefits" from "assets," appellants were wrong to 
equate the two terms for the purposes of s 208. See Malia, 
23 F.3d at 832 ("[The] language of [s 4044] demonstrates 
clearly that 'benefits' are elements that are conceptualized 
and treated differently in a plan termination than are the 
'assets' of that plan."); Brillinger, 130 F.3d at 63 ("Since 
[s 208] deals with the level of benefits, the reasonable inter-
pretation of that section is that it refers to those portions of 
[s 4044] regarding the level of benefits, rather than the part 
about distributing residual assets."). We join these courts in 
holding that s 208, by its plain language, ensures only that 
plan beneficiaries receive the same level of benefits after the 
spin-off that they would have received prior to the spin-off, 
and does not create an entitlement to the residual assets that 
might be available upon actual termination of the plan. See 
Brillinger, 130 F.3d at 63 ("The fact that upon actual liqui-
dation a participant may be entitled to receive some distribu-


tion of residual assets does not change the amount to be 
received as a 'benefit' [under s 208].").

 We also note that the plans at issue in this case are defined 
benefit plans, as opposed to defined contribution plans. Un-
der a defined contribution plan, each participant has an 
individual account; the level of benefits that he or she 
receives depends upon the performance of the assets retained 
in that individual account. See Von Aulock v. Smith, 720 
F.2d 176, 177-78 (D.C. Cir. 1983). In contrast, under a 
defined benefit plan, the employee is entitled to a fixed period 
payment upon retirement regardless of the performance of 
the underlying assets. See id. at 178. If the assets do not 
perform well, the employer must make up the difference. If 
they perform better than expected, however, the employees 
still may claim no more than the promised pension benefits 
under the plan. See Johnson v. Georgia-Pacific Corp., 19 
F.3d 1184, 1186 (7th Cir. 1994). Thus, "[p]articipants in a 
defined benefit plan are not entitled to increases in benefits 
because successful investment causes assets to grow to be 
greater than liabilities. There is nothing in [ERISA] to the 
effect that such growth in assets will cause an increase in 
benefits payable to participants at the time of a [spin-off]." 
Brillinger, 130 F.3d at 64. In short, AT&T must transfer to 
Lucent only those assets that are necessary to fulfill the new 
plans' defined benefit obligations.

2.Actuarial Assumptions

 In order to determine the level of funding necessary to 
provide for benefits pursuant to s 208, employers use actuari-
al assumptions. The applicable Treasury regulation man-
dates that these assumptions be "reasonable," and provides 
that "[t]he assumptions used by the Pension Benefit Guaranty 
Corporation [PBGC] ... are deemed reasonable for this 
purpose." 26 C.F.R. s 1.414(l)-(1)(b)(5)(ii) (1998). As the 
District Court correctly observed, this regulation does not 
mandate the use of the PBGC assumptions, but rather cites 
them as a "safe harbor." Systems Council, 972 F. Supp. at 
35; cf. Securities Indus. Ass'n v. Board of Governors, 807 
F.2d 1052, 1064 (D.C. Cir. 1986) (noncompliance with optional 


"safe harbor" securities regulation does not foreclose compli-
ance with the statute).

 The EBA does not employ the PBGC assumptions. Rath-
er, it provides that AT&T must use the actuarial assumptions 
that it currently uses to determine the minimum funding 
requirements for its plans under ERISA. See Systems Coun-
cil, 972 F. Supp. at 26. By law, these assumptions are 
required to be reasonable. See 26 U.S.C. s 412(c)(3)(A)(i) 
(1994). Before the District Court, appellants complained that 
"[t]here is no indication" that the assumptions provided for in 
the EBA are reasonable. Complaint p 43(d), reprinted in 
Joint Appendix ("J.A.") 1041. On appeal, appellants argue 
that, in order to comply with the reasonableness requirement, 
an employer must either use the "standardized PBGC as-
sumptions" or "obtain an actual commercial annuity quote at 
the relevant calculation date." Brief of Appellants at 30; see 
also Complaint p 40, reprinted in J.A. 1039.

 The District Court correctly dismissed appellants' claims. 
See Systems Council, 972 F. Supp. at 35-36. For one thing, 
appellants cite no case or Treasury regulation supporting the 
propositions they advance. Moreover, considering the rea-
sonableness of an actuarial assumption in a different context, 
the Supreme Court has noted that the "nature of the beast" is 
such that there may be several "equally correct approaches" 
to actuarial practice. Concrete Pipe & Prods., Inc. v. Con-
struction Laborers Pension Trust, 508 U.S. 602, 635-36 
(1993) (citation and internal quotation marks omitted). Ap-
pellants' complaint never explains why they think the EBA's 
prescribed approach is unreasonable. See Complaint pp 40-
43, reprinted in J.A. 1039-41.

 The salient point here is that, because they filed their 
lawsuit before they had any idea how much of AT&T's plan 
assets would be transferred to Lucent, appellants were in no 
position even to claim that the EBA's actuarial assumptions 
were unreasonable. See Systems Council, 972 F. Supp. at 36 
n.24 (noting that without any knowledge of the specifics of the 
proposed allocation, appellants could not allege unreasonable-
ness without risking Rule 11 sanctions). Subsequent to the 


commencement of this litigation, AT&T actually allocated its 
assets to Lucent and the specific details of the allocation are 
now publicly available. AT&T and Lucent employees now 
know how much money was transferred to the Lucent plans, 
how many employees were transferred to Lucent, and the 
demographics of those employees. Knowledge of each of 
these factors is crucial in determining whether the actuarial 
assumptions used in the allocation were reasonable. If plan 
beneficiaries now have a good faith basis for challenging 
AT&T's actuarial assumptions, they may consider filing suit 
under s 208. However, prior to the actual allocation, when 
they knew only that the EBA did not provide for the use of 
the PBGC assumptions or a commercial annuity quote, appel-
lants were in no position to state a viable claim under s 208.

3.Asset Valuation During the "Interim" Period

 Under the EBA, Lucent was to remain under the control of 
AT&T until all of the common stock of Lucent owned by 
AT&T was distributed to individual AT&T stockholders. See 
Systems Council, 972 F. Supp. at 25-26. Because the actual 
segregation of AT&T's assets did not occur on the exact date 
that the Lucent stock was distributed to the individual stock-
holders, the EBA provided for an adjustment "as of the date 
of the actual segregation by AT&T to the extent necessary or 
appropriate to reasonably and appropriately reflect addition-
al" gains made by the pension assets during the interim 
period between the stock distribution and the actual segrega-
tion. EBA s 3.2(b)(iii), reprinted in J.A. 2027. Appellants 
allege that this provision does not guarantee them the "bene-
fit of actual market earnings" on the assets during the 
interim period. Brief of Appellants at 24.

 Because the plans at issue are defined benefit plans, howev-
er, the participants are not entitled under ERISA to the 
benefit of any interim increase in the value of the assets. As 
discussed above, participants in a defined benefit plan are 
entitled only to the level of benefits promised them under the 
plan. Thus, the District Court was correct in holding that 
appellants "have no ownership interest in the assets of the 
plan, and the amount transferred must only be sufficient to 


provide 'benefit equivalence' after the transfer." Systems 
Council, 972 F. Supp. at 37 (quoting John Blair Communica-
tions, Inc. v. Telemundo Group, Inc., 26 F.3d 360, 367 (2d 
Cir. 1994)). This conclusion is in accord with decisions from 
other circuits that have considered the issue. See, e.g., John 
Blair, 26 F.3d at 366-67; Bigger v. American Commercial 
Lines, Inc., 862 F.2d 1341, 1348 (8th Cir. 1988). Indeed, 
under a defined benefit plan, it is virtually irrelevant whether 
the interim gains are transferred to Lucent; as the Second 
Circuit explained in John Blair, "it would matter little to the 
individual [participants] whether the plan lost out on [the 
interim gains] as long as those members were guaranteed 
their promised benefits at retirement." John Blair, 26 F.3d 
at 366.

4.Future Benefits

 Appellants' final claim under s 208 merits little attention. 
Appellants contend that the EBA violates ERISA because 
future adverse business experiences may render Lucent un-
able to fund its plans as well as AT&T has been funding 
them. But by its plain language, s 208 mandates transfer of 
assets sufficient to provide, "immediately after" the spin-off, 
the level of benefits each participant would receive "immedi-
ately before" the spin-off. 29 U.S.C. s 1058. Nothing in 
ERISA compels the original employer to fund the non-vested, 
future benefits of spun-off employees. See Bigger, 862 F.2d 
at 1345 ("A sponsor of an original defined benefit plan ... has 
no duty to guarantee that the sponsor of a spunoff plan will 
pay spunoff employee benefits earned in the future."). Ac-
cordingly, the District Court properly dismissed this claim. 
See Systems Council, 972 F. Supp. at 38.

 E.Contract Claims

 Appellants also raised common law contract claims. Spe-
cifically, they allege that they relied upon AT&T's promises to 
provide them pension and welfare plan benefits, and that 
Lucent might not be able to make good on those promises. 
The District Court properly dismissed these claims as unripe. 
See Systems Council, 972 F. Supp. at 38-40.


 First, appellants contend that the EBA absolves AT&T of 
liability "in the event that Lucent is unable to provide [the 
welfare] benefits now or in the future." Complaint p 58, 
reprinted in J.A. 1046. This claim is hardly fit for review, 
however, given that no participant in the welfare plan has 
alleged that Lucent has been unwilling or unable to provide 
the benefits it is obligated to provide. The District Court 
correctly determined that a declaratory judgment stating the 
extent of AT&T's liability in the event of a Lucent breach 
would violate Article III's requirement that a current case or 
controversy between the parties exist. See Systems Council, 
972 F. Supp. at 39; Duke Power Co. v. Carolina Envtl. Study 
Group, Inc., 438 U.S. 59, 81 (1978); United Steelworkers of 
America, Local 2116 v. Cyclops Corp., 860 F.2d 189, 194-96 
(6th Cir. 1988) (holding, in a virtually identical situation, that 
claims of pension plan participants were unripe).

 Second, appellants rely on a misguided application of a 
fundamental contract law doctrine. They claim that their 
contract claims are ripe because AT&T, in assigning its 
welfare plan obligations to Lucent, "clearly has disclaimed 
and repudiated" those obligations. Brief of Appellants at 38. 
It is true that, if a performing party unequivocally signifies its 
intent to breach a contract, the other party may seek dam-
ages immediately under the doctrine of anticipatory repudia-
tion. See Jankins v. TDC Management Corp., 21 F.3d 436, 
443 (D.C. Cir. 1994). However, AT&T has not repudiated 
anything; it has simply assigned its welfare plan obligations 
to Lucent. Absent a provision in the plans prohibiting such 
assignment, the action does not constitute an anticipatory 
breach.

 III. Conclusion

 For the reasons stated above, we affirm the judgment of 
the District Court.

 So ordered.