**AMERICAN ASSOCIATION OF RETIRED PERSONS, et al., Plaintiffs,**

**v.**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Defendant.**

Civ. A. No. 86–1740.

United States District Court, District of Columbia.

Feb. 26, 1987.

As Amended March 11, 1987.

On Motion for Reconsideration March 11, 1987.

Raymond C. Fay, Thomas C. Gibbon, David Deutsch, Haley, Bader & Potts, Edward F. Howard, Burton D. Fretz, Gregory French, Nat. Senior Citizens Law Center, Washington, D.C.; Steven Zaleznick, American Ass'n of Retired Persons, Washington, D.C., of counsel.

Richard K. Willard, Asst. Atty. Gen., Joseph E. DiGenova, U.S. Atty., Richard E. Greenberg, Thomas H. Peebles, Attys., Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant; Richard D. Komer, Acting Legal Counsel, Richard V. Roscio, Acting Associate Legal Counsel, Joseph N. Cleary, Acting Assistant Legal Counsel, Paul E. Boymel, Staff Atty., Office of Legal Counsel, E.E.O.C., Washington, D.C., of counsel.

## OPINION

HAROLD H. GREENE, District Judge.

The complaint alleges that the Equal Employment Opportunity Commission (EEOC) has been deliberately neglectful in the discharge of its duties under the Age Discrimination in Employment Act (ADEA) by failing for seven years and still refusing to require employers to make pension contributions for the benefit of those of their employees who continue to work after they reach what is called "normal" retirement age, generally age 65.[1] For the reasons developed below, the Court agrees with plaintiffs' claims. Although it is among the Commission's duties under law to eradicate age discrimination in the workplace and to protect older workers against discrimination, that agency has at best been slothful, at worst deceptive to the public, in the discharge of these responsibilities. These Commission derelictions are estimated to affect hundreds of thousands of older Americans, and to cost these individuals in lost pension benefits as much as $450 million every year.[2]

---

1. Each pension plan may determine its own "normal retirement age," but under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002(24), this age may normally not exceed 65. Thus, it may be assumed that the present controversy affects at a minimum the pension benefits of individuals who continue to work after age 65 to age 70, although where the normal retirement age is specified to be less than 65 years, a larger pool of workers is affected.

2. The EEOC concedes that its delay in implementing rules on pensions for older workers may cost such workers $450 million each year in benefits. See Transcript of Nov. 10, 1986 hearing of EEOC (Defendant's Supplemental Memorandum, Exhibit A at 3). Every year's delay has presumably saved employers a like

While almost immediately recognizing the incorrectness of a 1979 administrative interpretation that employer contributions were not required for workers who were still employed after reaching "normal" retirement age, the EEOC not only deliberately delayed for many years to correct the error and adopt a lawful rule (and still fails to do so) but it has refused even to remove from the books its own [3] incorrect 1979 interpretation on this subject, that can be and is being relied upon by employers who wish to avoid making payments toward the pensions of their older workers.

## I

### Introduction

In the present action, plaintiffs [4] allege that the EEOC has failed to implement a lawful policy on pension contributions and benefits for employees who work past "normal" retirement age. By way of a motion for summary judgment, they contend more specifically that the EEOC has unlawfully delayed rulemaking on pensions for these older workers, and that it has

improperly failed to rescind an "Interpretative Bulletin" that, contrary to law, supports the refusal of employers to make pension contributions for employee service that occurs after the "normal" retirement age. According to plaintiffs, the EEOC's inaction has allowed employers to withhold pension contributions, crediting, and accruals, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. (1986) (sometimes referred to herein as the ADEA). Plaintiffs request the Court to order the EEOC to publish proposed rules in the Federal Register, to rescind the Interpretative Bulletin, and to announce that employers may not rely upon that Bulletin as a good-faith defense to lawsuits for failure to fulfill their pension obligations.

■ The EEOC, by way of a motion to dismiss, seeks a ruling that the Court lacks jurisdiction to review this matter, or in the alternative, that the Commission has not been guilty of unreasonable delay. In addition to the filing of briefs, the two sides presented their arguments at a hearing.[5]

---

amount. It appears that about 200,000 workers are and perhaps as many as three million workers may be affected. *See* note 42, *infra.*

3. As described below, the interpretation was technically rendered by the Department of Labor but it was perpetuated when the EEOC assumed Labor's functions and responsibilities one month later.

4. Plaintiffs are the American Association of Retired Persons (AARP), which represents some 22 million persons over the age of 50; the Older Women's League, another national organization; and Nella Gent, a 66–year-old Cincinnati, Ohio employee whose retirement plan has refused to accept contributions on her behalf since she reached the age of 65.

5. Subsequent to the hearing, the Court requested the parties to brief the issue of whether plaintiffs have standing to bring this suit under *Von Aulock v. Smith,* 720 F.2d 176 (D.C.Cir. 1983). In *Von Aulock,* two private plaintiffs sued the EEOC because their pensions had not been increased to account for their work after the "normal" retirement age of 65. Plaintiffs alleged that their employers had maintained discriminatory plans because they were authorized to do so under the Interpretative Bulletin at issue in the instant case. The *Von Aulock* court ruled that plaintiffs had not satisfied the constitutional requirements for standing. According

to the court, plaintiffs' injuries were not "fairly traceable" to any action by the EEOC, because it was "highly likely that appellants' employers would continue to maintain their challenged plans even in the absence of the administrative support provided by the Interpretative Bulletin, ..." *Id.* at 184.

The Court has reviewed the briefs submitted by both sides and concludes that plaintiffs do have standing to maintain this action, for at least two reasons. First, the Court of Appeals for this Circuit recently found standing in a similar situation. In *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Brock,* 783 F.2d 237 (D.C. Cir.1986), a labor union challenged a decision of the Secretary of Labor not to bring enforcement actions against an employer and others for their alleged failure to comply with provisions of the Labor-Management Reporting and Disclosure Act. At issue, in part, was the Labor Department's interpretation of whether reports were required under the statute. The court found that all the constitutional requirements for standing were satisfied, including that the injury be "fairly traceable" to defendant's conduct and that the injury would likely be redressed by the relief sought. As to traceability of the injury to the Labor Department interpretation, the court said that the interpretation in effect legalized the private employers' activities, because "the current interpretation could quite

For the reasons discussed below, defendant's motion to dismiss will be denied, plaintiffs' motion for summary judgment will be granted, and judgment will be entered in plaintiffs' favor requiring prompt and effective implementation of the law by the EEOC. *See* Part VII, *infra.*

## II

### *Pre-EEOC History*

This lawsuit represents the culmination of a long history of administrative action and inaction that began in 1967, with the enactment by the Congress of the Age Discrimination in Employment Act.[6] It is the purpose of the ADEA, as stated in the statute itself, "to promote employment in older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621. In order to advance these goals, Congress prohibited discrimination "against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age." *Id.* § 623(a)(1).

There was one exception to this ban on discrimination, and it concerned employee benefit plans. Because it would cost employers more to provide certain benefits to older than to younger workers, Congress concluded that a requirement of equal benefits for all workers, regardless of age, might discourage the employment of older workers and thus undermine the very purposes of the Act. *See* S.Rep. No. 723, 90th Cong., 1st sess. 14 (1967). Accordingly, section 4(f)(2) of the statute provides that:

> [I]t shall not be unlawful for an employer ... to observe the terms of ... any bona fide employee benefit plan such as a retirement, pension or insurance plan, which is not a subterfuge to evade the purposes of [the Act]....

29 U.S.C. § 623(f)(2).

In 1969, the Department of Labor, which at that time had administrative and en-

---

likely be used as a defense to any criminal action against an employer for activity that was permitted while the interpretation was in force." *Id.* at 247–48. As to satisfaction of the redressability requirement, the court said that "a law-abiding employer considering the practices at issue will be put to the choice of either reporting them or refraining from engaging them in the first place, with the expected result that many will refrain. A decision in the Union's favor would thus clearly go a long way toward redressing the Union's injury." *Id.* at 247 (citations omitted). This decision undercuts the *Von Aulock* court's previous reluctance to find standing under similar circumstances.

Second, the EEOC itself has concluded, despite what the *Von Aulock* court previously said, that rescission of the Interpretative Bulletin "would probably cause some employers to modify current practices, thereby making continued employment a more viable option." EEOC Staff Analysis on Proposal to Require Pension Accrual after Normal Retirement Age (BNA June 27, 1984) at G–10. By the EEOC's own concession, then, the injury complained of by plaintiffs is to a significant extent "fairly traceable" to the actions of the Commission.

6. Not all of these events need to be detailed here. Most of the facts in this discussion are drawn from a "Chronology of Events" submitted as Exhibit 3 to Plaintiffs' Motion for Summary Judgment. Although it is not entirely clear who drafted this chronology (which includes non-factual commentary favorable to plaintiffs' argument), it seems to have been adopted, if not drafted, by the EEOC's Office of Congressional Affairs. *See* Letter from Phyllis Berry, Director of EEOC Office of Congressional Affairs, to Robert R. Davis (June 5, 1986) (Exhibit 12 to Plaintiffs' Motion).

The Commission has submitted its own "Counterstatement of Facts" which clearly does not take the position that the events listed in the chronology did not occur. Instead, the Commission submits that plaintiffs' version of events is selective, and it suggests the addition of one fact and the clarification of another. *See* Memorandum in Further Support of Motion to Dismiss at 3. These two proposals do not significantly detract from plaintiffs' chronology.

As to the purportedly additional fact that the EEOC's General Counsel recommended adoption of the Interpretative Bulletin in 1982, mention of this event is found in plaintiffs' Chronology of Events and is thus not new. As to the events that the Commission attempts to clarify, that is, the nature of a March 5, 1985 EEOC vote (*see infra*), it relies entirely upon the the the declaration of one Richard Komer. That declaration is of limited relevancy, but in any event the Court granted plaintiffs' Motion to Strike it (*see* Order of October 10, 1986) for the reason that Komer's statement was not based on personal knowledge and was beyond his competency as a witness.

forcement responsibilities for the ADEA, issued an interpretation explaining section 4(f)(2). The Department's interpretation suggested that employee benefit plans—including retirement, pension, and insurance plans—would be in compliance with the ADEA if the employer incurred equal costs in providing benefits for older and younger workers, "even though the older worker may thereby receive a lesser amount of [benefits]." 34 Fed.Reg. 9709 (1969). This interpretation, known as the "equal cost rule," remained in place for nearly a decade.

Two amendments to the ADEA enacted in 1978 raised questions about the scope of the benefits exemption and the equal cost rule. The first of these, now codified at 29 U.S.C. § 631(a), extended the statute's coverage to workers between the ages of 65 and 70. The second amendment, now codified at 29 U.S.C. § 623(f)(2), prohibited benefit plans from requiring the involuntary retirement of any individual because of his or her age.[7] Together, it was the effect of these amendments to extend the protection of the Age Discrimination in Employment

Act to those individuals who continued to be engaged in gainful employment past the age that for many benefit plans would be considered the "normal" retirement age. However, the precise benefit rights of these workers, and the obligations of their employers, were not specified, and several members of Congress called on the Department of Labor to provide prompt guidance in the form of regulations. *See* 124 Cong. Rec. 8219 (1978) (statement of Senator Javits) (Labor Department "intends to promulgate comprehensive regulations ... [and] is urged to act as soon as possible").[8]

The Department of Labor responded on May 25, 1979, not by promulgating regulations, but by issuing an interpretation—the "Interpretative Bulletin" that provides much of the background for this lawsuit. 44 Fed.Reg. 30,648 (1979) (codified at 29 C.F.R. § 860.120(f)(iv)(B) (1986)). The Interpretative Bulletin[9] takes the position that employers are free to cut off both their own contributions and the accrual of benefits for employees as of the time these workers reach a plan's "normal" retirement age—even if they continue to work

---

7. It was the purpose of this amendment to overturn the Supreme Court's ruling in *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977). In *United Air Lines,* the Court considered the legislative history of the ADEA, and in particular the remarks of Senator Javits, and found that the Act "protect[ed] an employer's right to require pre-65 retirement pursuant to a bona fide retirement plan...." *Id.* at 200–01, 98 S.Ct. at 449. A year later, Senator Javits, commenting on the new amendments, contended that the *United Air Lines* Court had misinterpreted his earlier statements. 124 Cong.Rec. 8218 (1978).

8. Technically, the question of benefits for those who work past "normal" retirement age had existed since passage of the ADEA, although it apparently did not earn attention until the 1978 amendments. Between 1967 and 1978, the ADEA protected workers through age 65, but many pension plans listed normal retirement age as age 60. "Therefore, ... the issue of what conduct is required by the ADEA of an employer relative to his post-normal retirement age employees was not a creature of the 1978 amendments to the statute." Proposed Recodification of 29 C.F.R. § 860.120 (Sept. 3, 1980) at 25–26.

9. The Bulletin does not have the binding force of law, *see American Postal Workers Union, AFL–CIO v. United States Postal Service,* 707

F.2d 548, 560 (D.C.Cir.1983), and the Court is therefore "free to substitute [its] own judgment for that of the agency in determining the propriety of" the Interpretative Bulletin. *Id.* at 560 (citing 2 K. Davis, Administrative Law Treatise § 7:13 (2d ed. 1979)). Although plaintiffs claim to challenge the Interpretative Bulletin on procedural grounds only—that is, they challenge the EEOC's failure to rescind a Bulletin that the Commission concedes to be illegal—the Court cannot avoid some examination of the Bulletin's substance. Were the Bulletin substantively proper, plaintiffs could hardly complain of the EEOC's failure to rescind it. But as the *American Postal* case, the Davis treatise, and other writings make clear, the EEOC is incorrect in asserting that the Court may not order rescission of the bulletin without a specific finding that it is clearly erroneous. "Although [it] may defer to the agency's interpretation," 707 F.2d at 560, the Court has much wider latitude in assessing so-called interpretive rulings of agencies than it would in assessing so-called legislative ones. *See generally* K. Davis, *supra.* In any event, judicial examination of the Bulletin is greatly simplified by the fact that the EEOC itself has conceded that the Bulletin constitutes an erroneous interpretation of the ADEA.

past that age to age 70.[10] That is where the matter stood when the Department of Labor relinquished jurisdiction over this subject.

## III

### EEOC Interpretations

On July 1, 1979, one month after the Department of Labor promulgated the Bulletin, the EEOC took over administration and enforcement of the Act. Reorg. Plan No. 1 of 1978, 43 Fed.Reg. 19,807 (1978). The Commission had previously indicated that it would undertake a complete review of all Department of Labor interpretations, including the Interpretative Bulletin in question here, 44 Fed.Reg. 37,974 (1979), and it did, in fact, begin such review. However, the Commission accompanied the start of the review process with two rulings which, as will be seen, were to have far-reaching consequences. First, the Commission stated that, pending completion of the review, all Labor Department interpretations would remain in effect, and second, that employers would be entitled to rely upon these interpretations as a good-faith defense to charges of age discrimination.[11] These rulings, of course, placed a premium on a rapid conclusion of the review process: without speedy review action, erroneous interpretations of the law would be perpetuated for extended periods of time, and they would continue to serve as "good faith" defenses for employers during those periods. That, as the subsequent history shows, is precisely what occurred in this instance.

In August of 1979 the EEOC's General Counsel advised his Commission that the Interpretative Bulletin was "incorrect and that the Commission should therefore undertake a further amendment" to it. Memorandum from Leroy D. Clark to EEOC Commissioners, Aug. 20, 1979.[12] During the months that followed, EEOC staff submitted alternate approaches to the Bulletin and solicited comments on these approaches, pursuant to Executive Order 12067. After revision, draft regulations were formally sent to other agencies for comment on April 22, 1980, and on May 2, 1980, EEOC Chairperson Eleanor Holmes Norton stated in an affidavit filed in another court action that, "[a]fter receipt and review of these comments, the Commission will publish its proposed modifications in the Federal Register for notice and com-

---

**10.** The Bulletin states, in part, that:

(1) A defined contribution plan may provide for the cessation of employer contributions after the normal retirement age of any participant in the plan. A defined contribution plan may also provide that no employer contributions shall be made on behalf of an employee who is hired after normal retirement age ...

(3) A defined benefit plan may fail to credit, for purposes of benefit accrual, service which occurs after an employee's normal retirement age.

(4) A defined benefit plan need not adjust actuarially the benefit accrued as of normal retirement age for an employee who continues to work beyond that age ...

(5) A defined benefit plan need not provide for the accrual of benefits for an employee who continues to work after normal retirement age.

(6) A defined benefit plan may provide, and may be amended to provide, that retirement benefits will commence at the actual date of retirement rather than at normal retirement age for employees who choose to work beyond normal retirement age. Employees re-

ceiving long-term disability benefits as a salary replacement may be deemed not to have "actually retired" and therefore need not be simultaneously provided with retirement benefits.

(7) A defined benefit plan need not take into account salary increases and benefit improvements under the plan which take place after an employee reaches the normal retirement age specified in the plan with respect to those employees continuing their employment beyond that age. However, benefit improvements for retirees may not be denied to such employees who do not receive the advantage of benefit accruals and increases given younger employees.

29 C.F.R. § 860.120(f)(iv)(B).

**11.** *See* 44 Fed.Reg. at 37,974–75 (1979) (referring to 29 U.S.C. § 626(e) and 29 U.S.C. § 259(a) ("[N]o employer shall be subject to any liability ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval or interpretation, of the agency....").

**12.** Plaintiffs' Exhibit 1 at 11.

ment by the public."[13] Proposed final regulations were submitted to the EEOC Commissioners on September 3, 1980,[14] with a vote on their adoption set for October 22. However, on October 20, two days before the date scheduled for the final vote, the proposal was removed from the agenda. The only explanation that appears ever to have been offered for this extraordinary action was that of Clarence Thomas, current Chairman of the EEOC, who has since informed a Senate committee that the proposed regulations had been "deep-sixed."[15] U.S. Senate Committee on Labor and Human Resources, Nomination Hearing, July 23, 1986.[16]

Nothing further of significance was done with regard to this matter for the next three years.[17] Ultimately, on September 15, 1983, the Commission revived the matter by once again asking for public comment, in order to "assist the Commission in analyzing the effects of these interpretive provisions and in order that the Commission will be fully apprised of the consequences of any modifications to these provisions." 48 Fed.Reg. 41,437. In June of 1984, the Commission voted for proposed rules (see Plaintiffs' Exhibit 5 at 1) and to rescind the Interpretative Bulletin and to replace it with its opposite: a requirement of post-normal retirement age contributions

and credits. Then, in March of 1985, it voted once more to approve the proposed rules.

Chairman Thomas informed the Congress at that time that, among other things, the Interpretative Bulletin was "not consistent with the stated purposes of the ADEA" (Hearings before the Senate Subcommittee on Aging, Oct. 17, 1985),[18] and that it was "facially inconsistent with the [Labor] Department's own long-standing administrative interpretation of the requirements of" the ADEA's benefit provisions. Id. at 4. Despite these assertions, however, the proposed pension rule proceeded no further along the bureaucratic path: it was not published in the Federal Register for notice and comment; no "regulatory impact analysis" was submitted to coordinating agencies pursuant to Executive Order 12291;[19] and the rule was not issued in final form.

On October 10, 1985, the American Association of Retired Persons filed a petition for rulemaking with the EEOC, asking for essentially the same relief it seeks in the instant action. Over eight months later, the EEOC rejected this petition citing the need—ironically, in view of all that had gone on before—to allow public comment, to prepare a regulatory impact analysis,

---

**13.** Plaintiffs' Exhibit 7 at 2. See note 25, infra.

**14.** These regulations were intended to remedy "the discriminatory treatment of employees aged 65 to 70" that results from the Interpretative Bulletin as then, and now written. See generally Plaintiffs' Exhibit 4.

**15.** The use of the phrase "deep-six" does not suggest a lawful or benign explanation for the Commission's action. That phrase has been a part of naval parlance as a synonym for burial at sea for a very long time. It moved landward and acquired more general notoriety when it became part of the Watergate folklore after it was revealed that John Ehrlichman had suggested to John Dean that he "deep-six" a number of sensitive documents to keep them from investigators. However, the actual deed was apparently done by L. Patrick Gray, the then Acting Director of the FBI. Historians will note that at least some of these documents figuratively rose to the surface in the subsequent Watergate investigations and trials. See United States v. Haldeman, 559 F.2d 31, 54 (D.C.Cir.1976).

**16.** Plaintiffs' Exhibit 8 at 39–40.

**17.** In the interim, a new General Counsel for the EEOC recommended formal adoption by the Commission of the Interpretative Bulletin, but nothing more came of that. Although the Commission relies on that proposal here, the recommendation has no significance in view of the fact that the EEOC soon was again seeking the Bulletin's rescission. The recommendation was at most a momentary detour from the seven-year path toward today's court-ordered result.

**18.** Plaintiffs' Exhibit 14 at 12.

**19.** This was so although Chairman Thomas informed the Congress in July of 1986 that such an analysis was complete and ready for submission. Nomination Hearing, see supra note 14, at 42. At that time Mr. Thomas also told Senator Kennedy that the analysis "has been completed about a month ago and was approved by the Committee recently. So the entire package is now ready to go. The underlying regulations were ready for quite some time." Id.

and to obtain review by the Office of Management and Budget before initiating rulemaking. The following year,[20] on November 10, 1986, the Commission retrogressed even further; it voted to terminate the rulemaking and not to rescind the Interpretative Bulletin.[21] On June 23, 1986, plaintiffs filed their complaint in this Court.

## IV

### *Jurisdiction*

The first question is whether the Court has jurisdiction to review plaintiffs' claims. The EEOC argues that whether, and when, it should proceed with rulemaking under the ADEA is a matter committed by law to its discretion, and that because of that fact its decision with respect thereto is not reviewable in court.[22] That argument is not well taken.

Under the Administrative Procedure Act it is presumed that there is a right to judicial review of administrative action. *See, e.g., WWHT, Inc. v. FCC,* 656 F.2d 807, 815 (D.C.Cir.1981). · However, the Act contains two familiar exceptions to the general availability of that right. The second exception, that relied upon here by the EEOC, precludes judicial review when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has made it clear that the "committed to agency discretion" exception forecloses judicial review only in the unusual case in which there is "no law to

apply." *See Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

The "law" that plaintiffs request the Court to apply is that pertaining to undue and improper delay by administrative agencies in deciding matters assigned to them. *See Nader v. FCC,* 520 F.2d 182, 206 (D.C. Cir.1975); *Geller v. FCC,* 610 F.2d 973, 979 (D.C.Cir.1979); *Intercity Transportation Co. v. United States,* 737 F.2d 103, 108 (D.C.Cir.1984). Indeed, as the Court of Appeals for this Circuit has only recently observed, "[w]hen an agency's recalcitrance, inertia, laggard pace of inefficiency sorely disadvantages 'the class of beneficiaries Congress intended to protect, judicial review ... is in order.'" *In re American Federation of Government Employees,* 790 F.2d 116 (D.C.Cir.1986).

■ The criteria for determining whether the presumption of review is overcome in the context of delayed agency action were restated in *Intercity Transportation Co. v. United States, supra.* In that case, the Court of Appeals said that actions "committed to agency discretion" are beyond the reach of judicial scrutiny when three factors are met: (1) there is little need to safeguard petitioner's interests; (2) review would impair the effectiveness of agency administration; and (3) the disputed issue is inappropriately drawn for judicial review. *Id.* at 107, citing *Natural Resources Defense Counsel v. SEC,* 606 F.2d 1031 (D.C.Cir.1979).

**20.** Several relevant events took place in Congress that year. On October 20, 1986, Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1986, Pub.L. 99–509, which includes provisions that will require pension contributions, credits, and accruals beyond normal retirement age. *Id.* §§ 9201–9204. The congressional bill was signed into law by President Reagan on October 21, 1986. The provisions of the Act will generally take effect for "plan years beginning on or after January 1, 1988," *id.* § 9204(a)(1), and for collectively bargained plans until as late as January 1, 1990. *Id.* § 9204(a)(2).

What is most noteworthy in the present context is that Congress explicitly disavowed any intent to express a view on the status of post-normal retirement age pensions under current law. *See* Conference Committee Report, Older Americans Pension Benefits, 132 Cong.Rec.

H11421, 11424, where the Committee noted that "[n]o inference is to be drawn ... as to whether or to what extent employee benefit plans might have been required to provide benefit accruals or allocations to employees' accounts" prior to the new legislation. *Id.*

**21.** *See* Defendant's Response to Plaintiffs' Supplemental Memorandum Regarding EEOC Inaction, Exhibit A (Transcript of EEOC Proceedings).

**22.** The Commission points to a provision in the ADEA to the effect that the Commission "may issue such rules and regulations as it may consider necessary or appropriate for carrying out this Act," 29 U.S.C. § 628, emphasizing use of the discretionary "may" twice in the same sentence. *See Gatter v. Nimmo,* 672 F.2d 343, 345 (3d Cir.1982).

As in *Intercity Transportation,* it is clear in the instant case that the general presumption of existence of judicial review is not overcome. First, there is a substantial need to safeguard plaintiffs' interests since as indicated above (note 2, *supra*), the EEOC itself concedes that the delay in implementing rules on pensions after normal retirement age is costing the older workers of this nation as much as $450 million each year. Second, review can hardly be contended to impair the effectiveness of the EEOC's administration, since at this juncture the scope of that review would have to consider only whether the Commission has acted legally in refusing to issue a rule notwithstanding its repeated completion of all the substantive and almost all the procedural prerequisites to such issuance. As the *Intercity Transportation* court explained, "limited review of Commission refusals to institute ... proceedings will not unduly hinder the Commission's regulation" in its field of expertise. *Id.* at 108. Third, the disputed issue is drawn in terms entirely appropriate for review. As indicated above, it is not unusual for agency inaction with respect to rulemaking to be subject to judicial review, and this Court is of course capable of applying the standards set by scores of judicial decisions under 5 U.S.C. §§ 555(e) and 706(1) in order to determine what constitutes "agency action unlawfully withheld or unreasonably delayed."

For the reasons stated, the Court finds no basis for concluding that it lacks jurisdiction to hear this case.

V

*Delay and the Rule of Reason*

In *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70 (D.C. Cir.1984) (*TRAC*), the Court of Appeals articulated six factors that courts should consider in deciding whether an agency has unreasonably delayed action, as follows:

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interest prejudiced by the delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC,* 750 F.2d at 80 (citations omitted).[23] It is thus appropriate to examine the facts of this case with this background and the six *TRAC* factors in mind.

The Court's first and foremost task, as noted, is to examine the entire history of this matter under a "rule of reason"—that is, to take a broad and common sense view of what has occurred, in view of all the circumstances.[24] One obvious ingredient in this analysis must be a determination of how long the EEOC has delayed, a point on which the parties are not in agreement.

In its motions and by way of oral argument, the EEOC has insisted that March 5, 1985 is the determinative date for judging whether it has unreasonably delayed action. It was on that day that the Commission voted to approve new benefit rules, and it is the Commission's view that until that day it had never taken a position on

---

**23.** The *TRAC* court applied these six factors to the case there at hand and found that the FCC's delay of nearly five years on one issue, and two years on another, warranted an order for the retention of jurisdiction in order to ensure that the delay would not continue. The court was particularly concerned because the delay could have allowed an erroneous "rate of return" on certain business operations to "become for all purposes, the accepted ones." *Id.* at 80–81.

**24.** *Cf. Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.,* 730 F.2d 64 (2d Cir.1984) (explanation of rule of reason under Sherman Antitrust Act).

these rules.[25] Indeed, elsewhere in its submissions, the Commission appears to argue that it has not delayed action at all, because it voted on November 10, 1986, to terminate the rulemaking process and not to rescind the Interpretative Bulletin. Beyond that, the Commission insists that whatever date of original delay is chosen, "the result is the same: the agency has been moving at a reasonable pace in this complex regulatory area."[26]

Even on the most charitable basis, the Commission's view of this matter cannot be characterized other than as absurd: were the Court to subscribe to that view, it would be abandoning the "rule of reason" for one that endorsed utter administrative capriciousness.[27] Any recapitulation of the fate of pension benefits for post-normal retirement age employees with an eye toward common sense leads to the conclusion that the EEOC began its decisionmaking process not in March 1985, but in August of 1979, nearly eight years ago.[28]

■ To recapitulate: it was in August 1979 that the EEOC's General Counsel decided that the Labor Department's Interpretative Bulletin needed to be changed because it was in error, and that he initiated the EEO process for the issuance of a lawful rule. The Commission's delay must of course be computed from the time that it learned of the error and began to take steps to rectify it.

Toward the "rectification" objective, the agency did, in fact, solicit comments during a fifteen-month period; pledged that the appropriate changes would "soon" be published for notice and comment; and concluded that the Interpretative Bulletin "result[s] in the discriminatory treatment of employees aged 65 to 70."[29] But then, suddenly and without explanation the Commission "deep-sixed" the regulations on October 20, 1980, two days before the scheduled final vote.

The ritual began once more (or continued, *see* note 30, *infra*) three years later. In September 1983, the Commission sought public comment on the same issues it had considered earlier, and in June of the following year, presumably after further earnest and conscientious consideration, it "voted to rescind" the Interpretative Bulletin. In light of the fact that all the substantive work had been completed prior to October 20, 1980, it is not at all clear on what basis the EEOC Chairman could truthfully testify before a congressional committee in September 1984 that this rescission vote was:

> the culmination of more. than 4 years of exhaustive study and review.[30]

In March of 1985, yet another procedural go-round began. The Commission once again solemnly expressed its intention to distribute proposed rules on this issue to other agencies—although these agencies had in fact already received the rules and expressed their general approval in 1980. And in October 1985, Chairman Thomas expressed the view (to a Senate subcommittee) yet another time that the Bulletin was

25. Motion to Dismiss at 17 n. 5.

26. *Id.*

27. As long as six years ago, the Court of Appeals for this Circuit, in affirming a dismissal for lack of ripeness, said with regard to the very subject under consideration here that "lengthy delay in the final promulgation of an interpretation said to be under reconsideration might, at some point, affect our view of the interests involved ... [D]elay past some point undercuts the force of an agency's assertion that meaningful reconsideration is taking place." *Farmers Group, Inc. v. Donovan*, 672 F.2d 893 (D.C.Cir.1981). In spite of that admonition, the courts are now told once again, many years later, that the EEOC is moving at a "reasonable pace."

28. In fact, one could reasonably compute the start of the process from an even earlier time—June of 1979—when the EEOC first began its review of prior interpretations.

29. Memorandum from EEOC Office of Legal Counsel to Commission, September 3, 1980 (Plaintiffs' Exhibit 4 at 8).

30. Hearing before the House Subcommittee on Labor-Management Relations, Committee on Education and Labor, Sept. 5, 1984 (Plaintiffs' Exhibit 9 at 24). If Chairman Thomas is to be taken at his word, the EEOC never ceased its work on the rules and the Bulletin, thus directly contradicting the agency's current claim that it only began its consideration of the subject on March 5, 1985.

"facially inconsistent with the [Labor] Department's long-standing administrative interpretations" of the ADEA.[31] Yet the Bulletin still stands, and the Commission does not propose to rescind it. As for the proposed rules, which were claimed in 1985 to require once again public and other comment, they are now likewise altogether off the table.

It is to be noted, too, that the Commission has been no more candid with this Court than with the Senate committees and the public. Throughout the pendency of the judicial proceedings, the EEOC's representatives stated or strongly implied that the rulemaking process was virtually complete, and that final rules would be issued promptly. For example, in its motion to dismiss, the Commission advised the Court that since March 5, 1985 it had "been moving expeditiously through the lengthy and complex study and formulation process which must precede notice and comment rulemaking."[32] At oral argument on October 9, 1986, the Commission's counsel stated that although in its view the EEOC was not required to issue the particular rules sought by plaintiffs, "[i]t just so happens that that is what the Commission is in the process of doing, ...,"[33] and further that "[t]he rule formulation process has just about run its route, and the Commission is adhering to its position that the Interpretative Bulletin should at some point be withdrawn."[34] Counsel repeated the contention that the rule formulation process was nearly complete at least twice more during the course of oral argument,[35] and he concluded by saying that "[t]he agency is running very, very close to being ready to act."[36] Indeed, when the Court commented that the Commission apparently was ready "to come out with a final rule next month," counsel did not contradict that statement but rather reiterated that he did not expect the Commission once again to "deep-six" the proposed rules.[37] These representations were followed within five weeks not by the publication of rules or the rescission of the Bulletin but by a cessation of all activity which left the admittedly erroneous 1979 interpretation intact and on the books.[38]

Within a "rule of reason" analysis of the facts of this case, what becomes perfectly clear is that for over seven years the EEOC has let stand an interpretation of the ADEA that it has itself consistently[39] considered to be erroneous. During that same seven-year period, the Commission piled delay upon delay. Several times, after first creating the impression that it was on the threshold of taking action to correct the mistake, it scuttled rules that were well along in the rulemaking process, that would have corrected the erroneous interpretation, and that would have helped save at least some of the $450 million lost by older American workers every year.

As for the Interpretative Bulletin, it still stands—although it is wrong—wrong ac-

**31.** Hearings before the Senate Subcommittee on Aging, Oct. 17, 1985 (Plaintiffs' Exhibit 14 at 12).

**32.** Motion to Dismiss at 10–11.

**33.** Transcript of oral argument at 5.

**34.** *Id.* at 9.

**35.** *Id.* at 9–10.

**36.** *Id.* at 11.

**37.** *Id.* at 23, 31.

**38.** The enactment of legislation by the Congress on October 21, 1986, shortly after the oral argument in this Court does not provide an excuse for the Commission's breach of faith for, as stated above (note 20, *supra*), the legislation was designed to have no effect on the existing legal situation: the EEOC is as free today to adopt rules or rescind the Bulletin as it was before October 21 of last year. In fact, by affirming that post-normal retirement age workers are to receive pension benefits, the Congress may actually be said to have endorsed the position that the EEOC again and again came close to adopting before now.

**39.** The EEOC has been consistent to this day on at least that one issue: that the original 1979 interpretation was wrong. In fact, the preamble to rules it proposed last year states unambiguously that:

> To the extent that pension benefits are conditioned solely on the impermissible factor of age, ... they would appear to be the kind [o]f arbitrary, i.e., unjustified, age differential the Act was designed to prevent.

Plaintiffs' Exhibit 11 at 6.

cording to the Commission's counsel, at least two of its chairpersons, and a number of votes by the Commission itself. Almost unbelievably, the Bulletin seems to remain in force because of the EEOC's belief that an incorrect interpretation of law is better than no interpretation, as the following interchange between the Court and EEOC counsel at oral argument reveals:

> Court: Of course, business is not bound by this Bulletin, is it?
>
> Counsel: That is correct.
>
> Court: So presumably they could just do whatever they wanted.
>
> Counsel: They could. That's correct.
>
> Court: What about that? Why isn't that a good idea? Let them do whatever they want.
>
> Counsel: Because they still look to it for guidance, and *to the degree it provides guidance, it's better than nothing,* and they would at that point—
>
> Court: *Even if it's wrong guidance?*
>
> Counsel: *Well, I would say that that's probably correct.*[40]

The Court concludes that a "rule of reason" analysis compels the conclusion that the EEOC has unreasonably delayed action with respect to the promulgation of rules and the rescission of the Interpretative Bulletin.

## VI

### Other Factors

In view of the very well-nigh conclusive result yielded by the rule of reason analysis, the other four [41] factors under *TRAC* can be dealt with more summarily.

First. The issue in question in this case involves not simple economics, but poten-

tially the health and welfare of millions of older workers of this nation,[42] and that renders the EEOC's delay, if anything, even less defensible than it might be otherwise. It is difficult to estimate how many American workers, who have contributed to the productivity of this nation past the age of 65, have already been deprived by the EEOC's inaction of the pension monies they earned through their post-age 65 labor. It is equally difficult to quantify how many of these older workers and their families are being or will be deprived of a decent standard of living—even being pushed below the poverty line—because the EEOC has seen fit for seven years so to manipulate its procedures as to leave standing an interpretation of the law that will not give them pension credit for post-age 65 work.

Second. The *TRAC* court held that in this context a court should consider the effects of expedition on other, higher or competing priority activities. To require the Commission to act now on the command of the Age Discrimination in Employment Act will not and cannot affect it adversely with respect to other activities, for it is difficult to see why the Commission—after so many years of "exhaustive review" of this precise issue, after formulating proposed rules twice, and after coordinating with other agencies at length again and again—would now have to divert any significant proportion of its manpower or other resources to bring this process finally to a legitimate conclusion. In that respect, this case differs from most in the delayed-action area, in that all the work has already been done—not once but twice or three times.[43]

---

**40.** *Id.* at 8.

**41.** The *TRAC* court also referred to statutory timetables but made it clear that any such timetable was to be used to supply content for the rule of reason. The Court here has fully taken account of the fact that there is no statutory timetable here—as incidentally there usually is not in this type of case, including in *TRAC* itself. *See, e.g., Community Nutrition Institute v. Young,* 773 F.2d 1356 (D.C.Cir.1985); *MCI Communications Corp. v. FCC,* 627 F.2d 322 (D.C.Cir. 1980).

**42.** As of 1981, approximately three million workers aged 65 and over were in the civilian labor force. EEOC Staff Analysis on Proposals to Require Pension Accrual After Normal Retirement Age, June 27, 1984 (Plaintiffs' Exhibit 5 at 7).

**43.** Whatever energies the EEOC must devote to rescinding the Interpretative Bulletin and to continuing rulemaking under existing law will not keep it from instituting rulemaking under Congress' new pension legislation when, as the EEOC's counsel has conceded, the newly-passed pension provisions "adopt in large measure the

Third. As for the interests prejudiced by the delay, it is appropriate to reiterate the EEOC's own concession that failure to rescind the Bulletin and to adopt valid rules under the ADEA may well be costing the older workers of this nation several hundred million dollars per year [44]—a truly staggering injury to their interests. To be sure, the nation's employers may have to make a like amount in pension contributions once a lawful rule is adopted, but the past delay and any future delay in requiring them to do so obviously did not and cannot prejudice them: the effect of the Commission's delay has been to provide these employers with a windfall.

Fourth. The *TRAC* decision does not require a finding of impropriety as a prerequisite to a decision holding delay to be unreasonable. Nevertheless, to the extent that such a finding can generally support an order to end administrative delay, it does so here. The repeated "deep-sixing" of proposed rules already formulated; the repeated false assurances to those directly involved, the public, and the Court, that final action was imminent; and the entire unfortunate history of administrative mishandling—all that supplies ample evidence of "impropriety lurking behind agency lassitude." 750 F.2d at 80. There are not likely to be many cases on record, if any, where a regulatory body has concluded again and again over a long period of time that its published interpretation of the law is wrong, yet has consistently failed, on one pretext or another, to rectify the error.

In sum, an examination of the factors enumerated by the Court of Appeals in the *TRAC* case compels the conclusion that the EEOC has improperly delayed the rescission of the Interpretative Bulletin and the conclusion of the rulemaking proceedings on this matter, and that the Court is therefore justified under law in taking action with respect thereto. The Court accordingly finds that the Commission has "unreasonably delayed" and "unlawfully withheld" action in violation of 5 U.S.C. § 706(1).[45]

## VII

### *Conclusion*

The Court of Appeals has aptly remarked that "excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decision-making into future plans." *Potomac Electric Power Company v. ICC*, 702 F.2d 1026, 1034 (D.C.Cir.1983). In a case such as the one before the Court today, in which an agency of government went to the well of publication of a lawful rule several times, only to recoil from final action again and again, this uncertainty is, by all means, an evil to be remedied.

But an ever greater evil exists in the failure of that agency to take formal, meaningful action when it knows its existing interpretation of the law to be erroneous and has repeatedly shouted the error from the housetops (but never from the pages of the Code of Federal Regulations). That inexplicable failure, moreover, has led and, if perpetuated, will continue to lead to a very real loss of pension income to perhaps millions of older workers across the country, workers who will need all of their legitimate retirement benefits when they are no longer able to work.

It is worth recalling in this connection that the government agency which has engaged in these tactics detrimental to work-

---

rules over which we're disputing today." Transcript of October 9, 1986, hearing at 2.

**44.** *See* note 2, *supra.*

**45.** A finding that a delay of seven years is unreasonable is of course well within the parameters of cases delineating improper delay under the Administrative Procedure Act. *See, e.g., Air Line Pilots Association, International v. Civil Aeronautics Board,* 750 F.2d 81 (D.C.Cir.1984)

(five year delay in adjudicating claims for unemployment assistance unreasonable); *Potomac Electric Power Co. v. ICC,* 702 F.2d 1026 (D.C. Cir.1983) (eight year delay in reaching agency decision unreasonable). The Court of Appeals has recently reiterated that, although there is no precise definition of reasonable delay, "it may encompass 'months, occasionally a year or two, but not several years or a decade.'" *Community Nutrition Institute, supra,* 773 F.2d at 1361.

ers over 65 is not one, such as the Department of Commerce, which might perhaps legitimately have an outlook favorable to business interests, but, sadly, a commission created by the Civil Rights Act of 1964, charged by law with the eradication of discrimination in the workplace on the basis of age, race, national origin, sex, and religion,[46] and one of whose responsibilities is thus to protect the older worker.

■ Since the Court has found that the EEOC's continued delay is entirely unjustified and unlawful, the only remaining question is what remedy should be mandated for this failure. The Administrative Procedure Act grants to the courts broad authority to "compel agency action unlawfully withheld or unreasonably delayed; ..." 5 U.S.C. § 706(1). One way to compel such action is to issue a writ of mandamus pursuant to 28 U.S.C. § 1361—the remedy sought by plaintiffs in the instant case. Although mandamus was an extraordinary remedy at common law, it is an appropriate one under the APA if a federal agency has failed to discharge a duty that Congress has intended it to perform, or has unreasonably delayed to take lawful action. *See TRAC, supra,* at 79–80; *Covelo Indian Community v. Watt,* 551 F.Supp. 366 (D.D.C.1982). That is what occurred here; a writ of mandamus is accordingly appropriate; and it will be issued, providing for the following relief.[47]

First, the EEOC is being ordered to rescind the Interpretative Bulletin codified at 29 C.F.R. § 860.120(f)(iv)(B) (1986), within twenty days hereof, by publishing a notice of rescission in the Federal Register, effective at once, such notice to include a state-ment that employers may no longer rely on the Bulletin under 29 U.S.C. § 626(e)(1), as a good-faith defense to liability. Second, the EEOC is being ordered promptly[48] to publish for notice and comment the proposed pension rule it voted on at its March 5, 1985, meeting, or a similar rule, which would require pension contributions, credits, and accruals for employees working beyond "normal" retirement age to age 70. Third, the EEOC is being ordered to proceed thereafter expeditiously with rulemaking in accordance with the requirements of the Administrative Procedure Act, and with the publication of a final rule no more than eighty days[49] from this date.[50]

In order to give meaning to these remedies, the Court will retain jurisdiction over this matter. Plaintiffs are invited promptly to seek relief in the event that there is a failure to comply with any of the above requirements. An appropriate Order accompanies this Opinion.

## ORDER

Upon consideration of plaintiffs' motion for summary judgment, defendant's motion to dismiss, the oppositions, replies, and supplements thereto, arguments presented orally to the Court on October 9, 1986, and the entire record herein, it appearing that defendant Equal Employment Opportunity Commission has unlawfully withheld or unreasonably delayed rescission of its Interpretative Bulletin on benefits for post-normal retirement age workers, and has unlawfully withheld or unreasonably delayed rulemaking on the same subject, it is

---

46. *See* Reorganization Plan No. 1 of 1978, Message of the President, 42 U.S.C. § 2000e–4.

47. Mandamus relief is coextensive with relief under 5 U.S.C. § 706(1) which thus also supports the Order being entered herein.

48. No specific deadline is being set herein for notice and comment publication, but in view of the overall deadline provided for below, the EEOC may wish to effect such publication within twenty days hereof.

49. This eighty-day period allow sixty days for any procedural steps following publication of the proposed rule. The EEOC has had seven years to complete its compliance with all the legal prerequisites to the establishment of a valid rule. To the extent that it has deliberately failed to do so, it will not now be heard to rely on its own wrongdoing as a pretext for yet further delay.

50. Should the Commission again engage in dilatory maneuvers, deceptive practices, or other measures the effect of which would be to delay issuance of a lawful rule beyond eighty days from the date of this Opinion, the Court will entertain an application to require more specific relief.

this 26th day of February, 1987, in accordance with the Opinion issued this date

ORDERED that defendant's motion to dismiss be and it is hereby denied; and it is further

ORDERED that plaintiffs' motion for summary judgment be and it is hereby granted; and it is further

ORDERED, pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1) that the Equal Employment Opportunity Commission shall within twenty days of the date of this Order rescind the aforementioned Interpretative Bulletin, codified at 29 C.F.R. § 860.-120(f)(iv)(B), by publishing a notice of rescission in the Federal Register, effective at once; and it is further

ORDERED that the Equal Employment Opportunity Commission shall include a statement in such notice of rescission that employers and others may no longer rely on the Interpretative Bulletin as a good-faith defense to liability for failure to contribute to a benefit plan; and it is further

ORDERED that the Equal Employment Opportunity Commission shall promptly publish for notice and comment in the Federal Register the proposed pension rule voted on at its March 5, 1985 meeting, or a similar rule, which would require pension contributions, credits, and accruals for employees working beyond "normal" retirement age to age 70; and it is further

ORDERED that the Equal Employment Opportunity Commission shall proceed expeditiously with rulemaking and shall publish a final rule within eighty days of this Order; and it is further

ORDERED that a copy of this Order shall be served forthwith each on Clarence Thomas, Chairman of the Equal Employment Opportunity Commission, Rosalie Gaull Silberman, William A. Webb, Tony Gallegos, and Fred W. Alvarez, Members of the Equal Employment Opportunity Commission; and it is further

ORDERED that the Court will retain jurisdiction over this action for the purpose of ensuring that the Commission, its Chairman, and its Members comply with this Order.

## ON MOTION FOR RECONSIDERATION

On February 26, 1987, this Court issued an Opinion and Order requiring defendant Equal Employment Opportunity Commission (EEOC) to take action on pension benefits for workers who work past the "normal" retirement age. That action mainly consists of rescinding an "Interpretative Bulletin" that continues to deprive these workers of such benefits, and issuing a final rule on this question within eighty days of the Court's ruling. The EEOC has now moved for reconsideration or for a stay of the February 26 Order pending an appeal. That motion will be denied in both respects.

■ The Court has already issued more than thirty pages of text explaining its ruling in this case, and only a brief statement of reasons for denying the instant motion is necessary. As to reconsideration, the EEOC continues to argue that the Court should withhold action because Congress has passed new legislation on these pensions, due to take effect in part in 1988. In response to this contention, the Court need only note again that Congress has explicitly stated that "[n]o inference is to be drawn" from the new pension amendments regarding the status of prior law. And while the EEOC correctly notes that the Court, at oral argument, stated that new legislation would moot this lawsuit, the Court was unaware at the time of either the scope of that pending legislation or of the Congress' specific refusal to take a position on issues arising from prior law.

As to the EEOC's motion for a stay, plaintiffs have ably responded with arguments that need not be repeated here. Suffice it to say that, given the delays necessarily inherent in the appellate process, to grant a stay pending appeal in a case that has presented an arbitrary delay of over seven years would be tantamount to a reversal of the Court's decision on the merits by authorizing and endorsing further Commission inaction. The Court declines to do so.

Accordingly, upon consideration of defendant's motion for reconsideration or, in

the alternative, for a stay, plaintiffs' opposition thereto, and the entire record herein, it is this 10th day of March, 1987

ORDERED that defendant's motion be and it is hereby denied; and it is further

ORDERED that defendant and its named Commission members shall comply promptly with this Court's Opinion and Order of February 26, 1987.